## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## (TRENTON VICINAGE)

| | |
|---|---|
| Deirdre Davidson a/k/a Deirdre Oagunju,<br>155 East Cliff Street<br>Somerville, NJ 18930<br>　　　　　　Plaintiffs, | Civil Action No. 1:10-cv-02825-NLH –JS |
| v. | Jury Trial Demanded |
| Cornerstone Bank<br>300 West Route 38<br>Moorestown, NJ 08057 | |
| E-Mortgage Management LLC<br>222 Haddon Avenue, Suite 2-A<br>Haddon Township, NJ 08108 | |
| E-Freedom Properties, LLC<br>222 Haddon Avenue, Suite 2-A<br>Haddon Township, NJ 08108 | |
| E- Properties, LLC<br>222 Haddon Avenue, Suite 2-A<br>Haddon Township, NJ 08108 | |
| Gregory Englesbe<br>222 Haddon Avenue, Suite 2-A<br>Haddon Township, NJ 08108 | |
| Joseph Spagnoletti<br>1 Marine View Plaza, Apt. 5D<br>Hoboken, NJ 07030 | |
| 　　　　　Defendants. | |

## <u>FIRST AMENDED COMPLAINT (AMENDED)</u>

**I.　　Introduction**

1.　　This is an action for an award of attorney's fees and costs, compensatory, statutory,

treble and punitive damages, also seeking equitable, injunctive and other relief, for Defendants' deed (conversion, "Foreclosure Rescue Scam", deed conversion, unfair or deceptive acts and practices, conspiracy and/or aiding and abetting same.

2.      Individually, jointly and/or severally, Defendants are liable to Plaintiffs for, but not limited to, the below causes of action and aforesaid remedies, for the reasons stated, which reasons are currently known, upon information and/or belief, and/or will be proven in discovery and/or at trial.

3.      At all times material, Plaintiffs here reserve the right to rely on the "Discovery Rule" and/or the Doctrine(s) of Equitable Tolling/Fraudulent Concealment, respectively.

## II.      Jurisdiction and Venue

4.      Jurisdiction in this Honorable Court is based on Jurisdiction in this Honorable Court is based on federal question conferred by 15 U.S.C §1601, Truth in Lending,  and 15 U.S.C §1679, Credit Repair Organizations Act. Supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

5.      Venue lies in this District in that the events giving rise to this claim occurred here, at least one (1) Defendant resides, maintains a principal place of business, is incorporated or does business here, or the subject of this action is situated within this district.

## III.      Parties

6.      Plaintiff, Deirdre Davidson is an adult individual currently residing at 80 Third Street, Somerville NJ 08876.  At all times material herein, plaintiff owned and occupied as her primary residence the property located at 155 East Cliff Street, Somerville, NJ 08876 ("Property" or "home").

7.      Defendant, Gregory Englesbe ("Englesbe"), is an adult individual conducting

business under the guise of three (3) limited liability New Jersey corporations over which he exercises complete dominion and control to effect foreclosure rescue scams and all of which are noted herein as separate defendants. Englesbe is CEO of all three such corporations was CEO of same at all times material herein.

8.      Defendant E-Mortgage Management LLC ("E-Mortgage") is a mortgage broker is a duly incorporated corporation under and by virtue of the laws of the State of New Jersey, maintaining a principle place of business at the above captioned address. At all times material E-Mortgage acted as broker for the 1st position mortgage loan made to plaintiffs and as co-broker for the 2nd position mortgage loan made to plaintiffs as described herein.

9.      Defendant E-Properties LLC ("E-Properties") is a duly incorporated corporation under and by virtue of the laws of the State of New Jersey, maintaining a principle place of business at the above captioned address. At all times material Englesbe employed the E-Properties entity to purchase properties from homeowners like plaintiff targeted by his foreclosure rescue scam.

10.     Defendant E-Freedom Properties LLC ("E-Freedom") is a duly incorporated corporation under and by virtue of the laws of the State of New Jersey, maintaining a principle place of business at the above captioned address. At all times material Englesbe employed the E-Freedom entity to ostensibly hold as escrow agent equity extracted from properties belonging to homeowners like plaintiff targeted by his foreclosure rescue scam.

11.     Defendant Cornerstone Bank ("Cornerstone") is a corporation engaged in the business of lending in the State of New Jersey with principal offices at the above

captioned address.

12. Defendant, Gregory Englesbe ("Englesbe"), is an adult individual employed by defendant E-Mortgage at the above captioned address.

13. Defendants excluding Cornerstone Bank are hereafter sometimes referred to collectively as "the Englesbe defendants".

14. Joseph Spagnoletti is an adult individual employed by the Englesbe defendants as a salesperson for E-Properties and E-Freedom and as a loan officer for E-Mortgage at all times relevant herein.

15. At all times material, Defendants were acting individually, within the course and scope of their authority and employment, and/or through their agents, servants, work-persons, and/or employees, respectively.

16. At all times material, Defendants acted individually and/or on behalf of each other as agents, servants, work-persons, alter egos, and/or employees thereof.

17. Defendants are liable to Plaintiffs, directly, indirectly, contractually, expressly, implicitly, as a matter of law and/or vicariously, including but not limited to liability via a third-party beneficiary relationship, and/or via conspiring and/or aiding and abetting.


**IV.     Facts**

**Set-up of the Sale/Leaseback Scam**

18. In or around June, 2007, Plaintiff received an initial contact from the ENgelsbe defendants in the form of a flyer advertising credit repair and mortgage assistance to distressed homeowners.

19. Plaintiff contacted E-Mortgage and spoke to defendant Spagnoletti.

20.     Spagnoletti explained to plaintiff that he would be her "handler" at E-Mortgage with regards to their program to save plaintiff's home.

21.     Plaintiff explained to Spagnoletti that she had recently lost her job.

22.     Spagnoletti explained to plaintiff that the E-Mortgage program would assist her as follows:

      a.   One of the Engelsbe defendants would "hold" the house for plaintiff;

      b.   Plaintiff would give E-Properties twelve (12) post dated checks to pay lease payments over 1 year while plaintiff secured another full time job;

      c.   After plaintiff gained full time employment, one of the Engelsbe defendants would attempt to secure her a loan with a lower monthly payment and transfer the home back to her.

23.     Approximately three (3) weeks later, Spagnoletti called plaintiff to advise her that she would need to come to E-Mortgage's office in Haddon Township, New Jersey to sign documents.

24.     On or about October 30, 2007, plaintiff arrived at E-Mortgage's offices and met with three (3) individuals there:

      a)   Greg Englesbe;

      b)   a male believed to be either lawyer Brendan Kavanugh or a representative of the title agent from Brightman Title;

      c)   an unknown male associated with Greg Englesbe.

25.     At the aforesaid document signing, plaintiff's only expectation was that she would sign a deed over to E-Mortgage to be held by them.

26.   At the aforesaid document signing, plaintiff was presented with and signed the following documents which she had never reviewed prior thereto:

  a)   A sale agreement selling her property to E-Properties for $186,000 dated September, 2007;

  b)   An option contract with E-Properties allowing plaintiff re-purchase of the property at the price of $264,750 or 75% of its appraised value;

  c)   A HUD-1 showing over $25,000 for "Lease Payment Escrow";

  d)   Twelve (12) post-dated checks which plaintiff signed to pay the lease payments.

  e)   A Net Lease agreement agreeing to pay monthly rent for a twelve (12) month term in which all maintenance, repair, utility, and insurance responsibilities are borne by plaintiff as tenant and that lease funds were to be placed in a non-interest bearing account;

  f)   A "Disclosure" form advising plaintiff she is entering a "Foreclosure and Debt Relief Program" to allow plaintiff to repurchase the property at 75% of its value within 12 months;

  g)   Another "Disclosure" form advising plaintiff she is entering a "Foreclosure and Debt Relief Program" wherein she must maintain the same job or job field and level of income;

27.   Plaintiff was informed that her rent payments would come from the loan proceeds.

6

28.     Upon information and belief, the Engelsbe defendants placed the aforesaid escrow funds in a bank account with Cornerstone from which it paid itself each month as described further hereinafter.

29.     On or about October 31, 2007, E-Properties drew down an existing line of credit from Cornerstone in the amount of $264,750 which reimbursed E-Properties the prior purchase price of $186,000, set aside $600.00 to a company called YCS for credit 12 months credit repair services, paid Cornerstone $18,532.50 in prepaid interest, and netted the Engelsbe defendants roughly $55,000 in loan proceeds therefrom.

30.     At some time during or after closing plaintiff signed an account document with Cornerstone Bank setting up an escrow account for deposit of her rent proceeds in which it was noted Plaintiff was unemployed.


        **Post Closing Facts**

31.     On or about April, 2008, plaintiff found a part time job in New York City and called Spagnoletti to advise him of this.

32.     Upon being so informed, Spagnoletti advised plaintiff that she would need a full time job to get the amount of monthly salary sufficient to qualify for a loan to repurchase the property.

33.     On or about May 1, 2008, plaintiff received a letter from a Lisa Atkins of defendant E-Properties discussing repair of her credit with a company called YCS.

34.     On or about September, 2008, plaintiff found a full time job and called Spagnoletti to advise him of this.

35.     Plaintiff did not receive any further contact from defendants until February, 2009, when defendant Englesbe contacted plaintiff by telephone to advise her she was in arrears on her rent.

36.     In March, 2009, defendant E-Properties brought suit against plaintiff to evict her from the property.

37.     In or around the same time, realtor Ileka Dingle (hereinafter "Realtor") came to the property and advised plaintiff that defendant Englesbe had asked her to place the property for sale.

38.     Upon plaintiff advising realtor that the notice of the property's sale was a complete surprise to her, realtor advised plaintiff that plaintiff was the third individual in a property owned by Englesbe who taken by surprise by the realtor's notice of the property's sale.

39.     Realtor told plaintiff that Englesbe was a "crook" and that she should retain a lawyer.

40.     The Englesbe defendants never engaged in any credit repair with or on behalf of plaintiff.

41.     By operation of the Defendants' rescue/credit repair scheme, they stole approximately $165,000.00 in equity from the Plaintiffs.

**<u>Nature of the Scam Generally</u>**

42.     The scheme devised by the Englesbe defendants was nothing more than a disguised means of equity extraction sold to lenders like Cornerstone and other local

banks as a foreclosure rescue/credit repair program (hereinafter "the Program"). The pitch to these banks was broadly as follows:

a) The Program was a means to help distressed borrowers save their homes by sale to the Engelsbe defendants and then, through lease back and credit repair, qualify them for repurchase of their homes at an option price set at the foreclosure buyout price plus a premium;

b) Lenders like Cornerstone would extend the Engelsbe defendants a line of credit to take a loan against any Program related property at the option price to reimburse the Engelsbe defendants' capital, thereby allow more purchases for the scheme, and turn a quick profit on prepaid interest for a participating lender like Cornerstone.

43.   To consumers like plaintiff, the Engelsbe defendants sold the Program under the false pretext of foreclosure rescue and credit repair to homeowners like plaintiff when, in fact, the scheme's terms, including many terms that were undisclosed and/or concealed from Plaintiff, were impossible for an unemployed borrower like plaintiff to fulfill.

44.   As a result, the transaction was a loan and an equitable mortgage between plaintiff, as the implied in fact borrower, and Cornerstone, the terms of which were understood by all parties to actually involve a temporary transfer of title and continued occupancy of the home by plaintiff, but unbeknownst to plaintiff, designed to result in subsequent default by the Plaintiff who was not a viable Program candidate.

45.   The disguised loan transaction disclosed none of the legally required information to plaintiff, including but not limited to disclosures required by the Truth in Lending law

and other laws requiring disclosure of the cost of funds, interest rates, monthly payments, fees and charges required and written itemization of the amount financed.

46.    Additionally, the Program's representation of credit repair was grossly false because the mortgage would not be - and indeed was not - in the name of Plaintiff so that any payments towards that mortgage would not have any effect whatsoever on Plaintiff's credit rating or report.

47.    The transaction in question is not the only instance of the defendants targeting vulnerable plaintiffs for rescue transactions based on its likelihood of failure as described herein. In fact, the home rescue and credit repair scheme was part of an elaborate plan among several of the defendants to strip the equity from vulnerable homeowners. Multiple instances of such conduct have been discovered to date and will be demonstrated at trial to make clear the breadth of the scheme and the extent of the victimization that these Defendants perpetrated.

48.    Cornerstone was actively involved in multiple transactions involving the parties herein, including E. Properties, E. Freedom, and Englesbe, and knew or should have known of the plainly visible irregularities in plaintiff's transaction especially involving her unemployed status and inability to comply with the onerous buyback terms under the Program.

49.    For example, one consumer victim of Cornerstone and the Engelsbe, New Jersey resident Carl Leitz, attempted to withdraw money from a money market account in his name that was set up by Engelsbee at Cornerstone Bank from $210,000 of Leitz' equity, an employee of Cornerstone called Engelsbe to advise him of this attempted withdrawal and that Mr. Leitz had applied for food stamps, see Leitz v. Cornerstone et al., Superior

Court of New Jersey,  Chancery Division, Burlington County, Docket No. C-066-09. These communications and the mortgage loan show a nefarious connection between the Engelsbe scheme and defendant Cornerstone and were in breach of those defendant's fiduciary and other legal duties and obligations to Plaintiffs.

50.    Accordingly, Cornerstone had actual as well as constructive knowledge of such deficiencies in plaintiff's transaction and other transactions brought to it under the auspices of the Program.

51.    Cornerstone intentionally or recklessly disregarded such knowledge and duties of due diligence thereby rendering their mortgage subject to attack.

52.    At all times herein, plaintiff exercised due diligence in ensuring that her interests were being protected and promises made to her were adhered to and that discovery of the defendants' conduct was actively concealed by deceptions of the defendants described above at least until September, 2008 when plaintiff advised Spagnoletti of her new job status and failed to receive any acknowledgment or assistance based on her changed circumstances.

## V.    Causes of Action

53.    Paragraphs above are incorporated by reference as if fully set forth at length herein and below.

### COUNT I - Credit Repair Organizations Act ("CROA")
*(Plaintiff v. All defendants excluding Cornerstone Bank)*

54.    Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

55.    At all times material, Plaintiff was a "consumer" as defined by 15 U.S.C & §1679(a)(1).

56.    At all times material, the Englesbe defendants, individually, and together with each other constituted a "credit repair organization" as defined by 15 U.S.C §1679(a)(3).

57.   The promise of credit repair by the Englesbe defendants was mere artifice to cloak their true intention to take plaintiff's property in that plaintiff was transparently not a candidate for credit repair and buy back of her home for the following reasons:

   a)   Plaintiff was unemployed at the time of the transaction without any imminent prospect of employment;

   b)   Plaintiff was given disclosures stating that the foreclosure relief and credit repair was specifically premised on her maintaining "the same" employment and income which the Englesbe defendants knew plaintiff did not have;

   c)   The mortgage taken by the Engelsbe defendants would not be in plaintiff's name so none of the payments would accrue to and therefore improve plaintiff's credit;

   d)   Only $600.00 was paid for credit repair from the October 31, 2007 drawdown of the Cornerstone credit line by the Engelsbe defendants which loan information was never seen or made known to plaintiff.

58.   For the reasons before said at all times material Defendants were in violation of 15 U.S.C §1679, et seq. including but not limited to violating the "Prohibited Practices" section of the Act as follows:

   (a)   "make or use any untrue or misleading representation of the services of the credit repair organization; or…"

   (b)   "engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

### COUNT II - USURY
### (ALL DEFENDANTS)

58.     Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

59.     Defendants' sale/leaseback transaction was in effect a loan made to Plaintiff since Defendants merely loaned funds to Plaintiff for one year with the option of re-purchase for $264,750.00, which was $78,750.00 <u>more</u> than Defendants paid Plaintiffs for it.

60.     Essentially the Deed into Defendants served as an equitable mortgage for the performance of Plaintiffs' payment of the loan transaction.

61.     The $55,000.00 proceeds corresponds to an annual interest rate in excess of 20% and is in excess of the civil usury statute, <u>N.J.S.A.</u> 31:1-1, and when combined with the costs and other monies may violate the criminal usury statute, <u>N.J.S.A.</u> 2C:21-19.

### <u>COUNT III</u> – Truth-in-Lending Act ("TILA")/Home Ownership and Equity Protection Act ("HOEPA")
*Plaintiff v. Cornerstone*

59.     Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

60.     At all times material, Defendant Cornerstone, in the ordinary course of business, regularly extended and/or arranged for the extension of consumer credit and/or offered to extend or arrange for the extension of such credit in more than four installments or with a finance charge.

61.     For the reasons set forth herein, the Loan to E-Properties was a disguised extension of a consumer line of credit secured by a mortgage on a residence and therefore subject to Plaintiff's right of rescission, and/or statutory and/or actual damages described by 15 U.S.C. §1635 and 12 C.F.R. §226.23.

62.     In said loan transaction, Plaintiff did not receive the disclosures required by the Truth-In-Lending A ct ("TILA"), 15 U.S.C. §1601, et. seq., and Regulation Z of the Federal Reserve Board ("Regulation Z"), 12 C. F.R §226.1 et seq.

63.    By failing to deliver any loan documents other than a partial HUD1 at the closing,

Defendant Cornerstone failed to deliver all "material" disclosures required by TILA and

Regulation Z, including but not limited to:

a)  Failing to properly and accurately disclose the " amount  financed,"
    described in and in violation of Regulation Z §226.18(b) and 15 U.S.C.
    §1638(a)(2)(A);

b)  Failing to clearly and accurately disclose the " finance charge"  described
    in and in violation of Regulation Z §226.4 and 15 U.S.C. §1638(a)(3);

c)  Failing to clearly and accurately disclose the " annual percentage rate,"
    described in and in violation of Regular Z § 226.18(e) and 15 U.S.C.
    §1638(a)(4);

d)  Failing to comply with the special disclosure requirements of Regulation Z
    §226.32;

e)  Failing to timely provide each Plaintiff with two (2) copies of a Notice of
    his/her Rights to Rescind the Transaction and/or one (1) copy each of the
    form Disclosure pursuant to TILA and/or HOEPA.

64.    Due to the violations of TILA and Regulation Z, Plaintiff has an ongoing right to

rescind the transaction, and/or right to recoupment, statutory and actual damages.

65.    Plaintiff has rescinded the transaction by its prior filing.

66.    Cornerstone is also a creditor involved in a consumer credit transaction within the

meaning of the Home Ownership and Equity Protection Act, 15 U.S.C. §1601 et seq.

(hereinafter, "HOEPA").

67.    The loan (disguised as a sale) that Cornerstone extended to Plaintiff is a high rate

mortgage within the meaning of HOEPA, 15 U.S.C. §1602(aa), in that the total interest

rate exceeds the statutory threshold based on the $78,750.00 due on the loan after one (1)

year.

68.    Because  the  consumer  credit  transaction  described  herein  met  the  HOEPA

definition of a high rate mortgage, the transaction was subject to additional disclosure requirements that must be provided three days in advance of the consummation of the transaction in accordance with 15 U.S.C. §1639(b).

69.    Cornerstone failed to furnish the required HOEPA disclosures to Mrs.  Scott.

70.    Cornerstone has engaged in a pattern or practice of extending credit to consumers based on the value of a consumer's collateral without regard to the consumer's repayment ability, including their current and expected income, current obligations and employment in violation of 15 U.S.C. §1639(h).

71.    Cornerstone extended credit to Plaintiff based upon the value of her collateral without regard to her repayment ability.

## COUNT IV
## VIOLATION OF THE NEW JERSEY HOME OWNERSHIP
## SECURITY ACT (N.J.S.A. 46:10B-22 et seq.  "N.J. HOSA")

71.    Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

72.    Cornerstone is a creditor subject to the imposition of liability pursuant to N.J.S.A. 46:10B-33 and N.J.S.A. 46:10B-24.

73.    The transaction is a high cost loan as defined by N.J. HOSA.

74.    The transaction violates N.J. HOSA because Cornerstone failed to provide Plaintiff with the Notice and Counseling required by N.J. HOSA for high cost home loans.

## COUNT V
## Consumer Fraud Act (CFA)/Fraud/Fraudulent Misrepresentation

72.    Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

73.    The Defendants made the following representations expressly or impliedly to the plaintiff:

(a) Spagnoletti, individually and on behalf of the Englesbe defendants, represented that he would help save plaintiff's home by a program that would place plaintiff with an investor, repair her credit, and then qualifying and brokering her a new mortgage loan to repurchase her home;

(b) The Englesbe defendants represented that they were providing a foreclosure and debt relief program to plaintiff when, for the reasons stated heretofore, plaintiff's financial circumstances and the false nature of the credit repair in no way complied with the terms of the Program itself or realistic prospects otherwise of rescuing the home while plaintiff was unemployed;

(c) Spagnoletti, individually and on behalf of the Englesbe defendants represented that they did not want to take plaintiff's home;

(d) Cornerstone joined in the misrepresentations of the Engelsbe Defendants by funding the transaction even though Cornerstone knew from the account document signed at closing noting Plaintiff was unemployed that Plaintiff did not qualify for the Program and would simply have her equity stripped from her home as a result of participation in the Program.

74.    The representations and/omissions of said Defendants in the prior paragraph were known or should have been known to those defendants to be false when made because the program proposed to plaintiff was not intended for unemployed homeowners.

75.    The aforesaid false representations and/omissions of said Defendants were material in nature because Defendants placed plaintiff into the program knowing she would fail to regain her home, default, and lose her home to Defendants.

76.    Because Defendants had sold their rescue program to lenders like Cornerstone on the basis that it would follow the Program criteria, Defendants knew they made the aforesaid misrepresentations to plaintiff with the intent to deceive and defraud the plaintiff into selling her home so that said defendants could strip the home's equity in contravention to the Program's stated goals because plaintiff did not meet the Program's criteria for rescue and credit repair.

77.    Therefore, Defendant Cornerstone knew or should have known that they were not funding a viable candidate for the Engelsbe defendants' program, and instead were funding a scheme to cheat plaintiff out of her equity in the home instead of rescue that equity from loss in foreclosure.

78.    The plaintiff justifiably relied on Defendants' misrepresentations before, during, and after the Loan transactions that her home was going to be saved by the escrow of funds for lease back shown on the HUD1.

79.    As a result of the aforementioned conduct, the plaintiff suffered the damages outlined above and below in addition to extreme mental anguish, frustration, humiliation, embarrassment and stress.

80.     The defendants' actions as hereinbefore described, including but not limited to using a fraudulent lease back/credit repair scheme to take plaintiffs' home, were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

81.     Defendants intended for Plaintiff to rely on the defendants' aforementioned acts creating the appearance of a lawful real estate and loan transaction when such acts in fact involved unconscionable commercial practices, deception, fraud, false pretense, false promise and misrepresentation, and Plaintiff did rely on same.

82.     The foregoing acts by Defendants constitute violations of New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-2 at seq., as a result of which Plaintiff suffered ascertainable loss of over $160,000 in lost equity and over $25,000 in rent payments Plaintiff could have gotten the benefit of through sale of the home rather than a fraudulent no benefit rescue transaction.

## COUNT VI - Conspiracy and Aiding/Abetting

83.     Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

84.     At all times material, Defendants acted conspiratorially, in their design in concert, and/or aiding and abetting each other to perpetrate the harms and/or misconduct aforesaid.

85.     The agreement among defendants constituted a combination of two or more persons acting with common purpose to do unlawful acts (use the pretext of a sale/lease back to investor combined with a credit repair scheme to steal property through a foreclosure rescue loan scam) and to do lawful acts (arrange purchase mortgage loans) by unlawful means (fraudulently and in violation of law as set forth in the foregoing Counts).

86.   Defendants committed overt acts in pursuance of the common purpose as set forth above. Upon information and belief, the overt acts included:

(a) The Engelsbe Defendants sold the rescue program to plaintiff with Cornerstone's funding based upon actual or constructive knowledge that plaintiff's unemployed status at the time of the loan prevented her from being a viable candidate for the rescue program under its express terms;

(b) Defendants took over $190,000 from plaintiff in the amount of the home's equity over and above pre-existing liens and provided no credit or financial services to plaintiff in return to assist her in gaining a new mortgage loan to regain her home;

(c) Defendants promised credit repair and financing assistance to lull plaintiff into a false sense of security that she would be able to repurchase her home without seeking such assistance independent of defendants;

87.   Defendants had knowledge of their respective overt acts, omissions, evasions, and concealments, and deliberately targeted plaintiff as a vulnerable individual all of which have contributed to plaintiff's damages and losses.

88.   Plaintiff was damaged by the illegal agreement among the Defendants in the principal amount of the loan less any existing valid liens on the home.

89.   At all times material, as explained more fully above, Plaintiffs justifiably and detrimentally relied upon the material fraud and fraudulent misrepresentations of Defendants, which resulted in the above damages.

## COUNT VII - VIOLATION OF SECURITY DEPOSIT ACT
## (ENGELSBE DEFENDANTS)

90.     Plaintiff repeats and re-alleges all paragraphs above as if fully set forth herein.

91.     The Englesbe Defendants obtained from the Plaintiffs a sum totaling at least $24,000.00 representing security for the Plaintiffs' performance under the Lease Agreement.

92.     Pursuant to the Security Deposit Act, a landlord may not obtain more than one and one-half's month rent as security for the performance of a Lease by a tenant.

> i.   These Defendants obtained a sum more than ten (10) times that which is allowed by law.
>
> ii.   The Security Deposit Act requires that a security deposit be deposited into an interest bearing account where the interest accruing thereon belongs to the tenant.
>
> iii.   Additionally, the agreement prepared by these defendants provided that the security deposit would be placed into an interest bearing account.
>
> iv.   These defendants did not deposit the funds into an interest bearing account or an escrow account.
>
> v.   Instead, these defendants placed the money into a non-interest bearing account as expressly admitted in the lease agreement possibly commingled with other funds of other Program victims.
>
> vi.   Additionally, these defendants forced the Plaintiffs to execute, a year in advance, twelve consecutive rent checks which were retained by these defendants.

vii.   Each month, these defendants would immediately deposit the post-
dated rent checks from the non-interest bearing account to their
business account.

viii.   Plaintiffs were damaged by the acts and omissions of these
defendants.

ix.   By violating the Security Deposit Act, these Defendants are liable for
all damages caused and are further liable for consumer fraud as set
forth herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests this Honorable Court enter judgment in their
favor and against Defendants, individually, jointly and/or severally, in an amount in
excess of seventy-five thousand dollars ($75,000), plus such other and further relief as
this Honorable Court deems necessary and just, and to Order the following relief:

A.   Rescission of the loan transaction, including a declaration that Plaintiff is are
not liable for any finance charges or other charges imposed at closing of the
transaction;

B.   Return of all funds paid to Cornerstone for the loan transaction;

C.   Statutory damages pursuant to the Truth in Lending Act and Home Ownership
and Equity Protection Act.

D.   Termination of any security interest in the home created under the Loan
transaction between E-Properties and Cornerstone;

E.  Declaration by the Court that deed in favor of defendant E-Properties is void and title is revested in plaintiff;

F.  Declaration that an equitable Mortgage exists between plaintiff and Cornerstone securing an amount of principal to be determined by litigation.

G.  Actual damages in the amount of the equity in the home lost by plaintiff and any other money or real or personal property acquired by means of any alleged practice herein to be unlawful and found to be unlawful pursuant to N.J.S.A. 56:8-8;

H.  Punitive, and treble damages pursuant to N.J.S.A. 56:8-13;

I.  Punitive damages for fraud;

J.  Reasonable Attorneys fees, expenses, and costs of suit.

K.  Such other relief as this honorable Court determines to be fair, just and proper.

## **JURY PRAYER**

Plaintiff demands trial by jury.

Dated: March 8, 2011

/s/ Matthew Weisberg, Esquire
WEISBERG LAW, P.C.
7 S. Morton Ave.
Morton, PA 19070
(610) 690-0801
Attorney for Plaintiff